# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**CASE NO. 16-23894-CIV-MARTINEZ/GOODMAN**

DEL MONTE INTERNATIONAL GMBH,

      Plaintiff,

v.

TICOFRUT, S.A.

      Defendant.

_____/

## ORDER ON DEFENDANT'S COMMON INTEREST DOCTRINE CLAIM CONCERNING FOUR EMAILS (WITH THEIR ATTACHMENTS)

In his 2012 song "Pilot Jones," Frank Ocean explained that "we once had things in common / now the only thing we share is the refrigerator."[1] On the other hand, singer/songwriter Alicia Keys provided the opposite-end-of-the-spectrum approach to having similar ideas in her "In Common" song, when she disclosed that "We got way too much in common since I'm being honest with you."[2]

So this discovery Order concerns the issue of whether the defendant and a non-party have enough in common to invoke the common interest doctrine, which provides protection from waiver when otherwise privileged material is shared with others.

_____

[1]      FRANK OCEAN, *Pilot Jones, on* CHANNEL ORANGE (Def Jam 2012).

[2]      ALICIA KEYS, *In Common, on* HERE (RCA 2016).

Specifically, Plaintiff Del Monte International, GMBH ("Del Monte") and Defendant Ticofrut S.A. ("Ticofrut") are wrangling over four emails exchanged between Ticofrut's CEO, Roberto Aragon, and Jorge Gurria, the CEO of a Costa Rican pineapple grower known as Inversiones y Procesadora Tropical, S.A. ("INPROTSA"). INPROTSA had been selling pineapples to Ticofrut, but Del Monte was troubled by this because it had obtained an arbitration award against INPROTSA. The arbitration award enjoined INPROTSA from selling pineapples to third parties.

After Ticofrut failed to comply with Del Monte's demand that it stop buying pineapples from INPROTSA, Del Monte filed this lawsuit against Ticofrut and propounded a request for production. Ticofrut withheld certain documents from production, including the four emails at issue here. Ticofrut contends that these four emails (with attachments) are exempt from discovery under the common interest doctrine. If adequately established, then this doctrine permits parties to share work product and attorney-client privileged documents with other parties sharing an interest in actual or potential litigation against an adversary (when the nature of the common interest is legal and not solely commercial), without losing the privilege.

For the reasons outlined in greater detail below, the Undersigned concludes that Ticofrut has not met its burden of establishing all the elements of the common interest

doctrine for the four documents at issue here. Therefore, Ticofrut shall produce those documents within three business days of the date of this Order.

Moreover, because I have determined that Ticofrut failed to meet its burden to establish the common interest doctrine, there is no need to address Del Monte's waiver argument (i.e., that Ticofrut waived the common interest doctrine by producing the Indemnity Agreement between Ticofrut and INPROTSA and by submitting Mr. Aragon's declaration). Similarly, there is no need to address Del Monte's argument that its so-called substantial need for these four documents is sufficient to trigger the exception to work product protection afforded by Federal Rule of Civil Procedure 26(b)(3).

**Factual Background**

With a few modest edits, this is how Ticofrut portrayed the facts in its memorandum [ECF No. 109]:

Del Monte entered into an agreement dated May 9, 2001 (the "Contract") with INPROTSA, pursuant to which Del Monte agreed to provide MD-2 pineapple seeds to INPROTSA, and INPROTSA agreed to develop and sell MD-2 pineapples to Del Monte. [ECF No. 1, Compl. ¶ 8 & Ex. A ¶¶ 1-3]. Beginning in 2011, Del Monte authorized INPROTSA to sell certain pineapples to Ticofrut, a Costa Rican manufacturer of juice

products. [ECF No. 16, Ex. A ¶ 5; *see also* 1/12/17 Hearing Tr. at 23:15-21 25:8-19, 77:18-21].

In March 2014, after the Contract expired, Del Monte initiated an arbitration proceeding against INPROTSA, and on June 10, 2016, an arbitral tribunal issued an award (the "Award"), finding, *inter alia*, that until INPROTSA had complied with certain obligations under the Award, INPROTSA was enjoined from selling to third parties all but 7% of its produce originating from seeds obtained from Del Monte. [ECF No. 1, Compl. ¶¶ 13, 15].

On June 21, 2016, Del Monte notified Ticofrut of the Award and demanded that Ticofrut immediately cease purchasing pineapples from INPROTSA. [ECF No. 106, Ex. A]. Del Monte also threatened to assert a claim against Ticofrut for "tortious and illegal interference and violation of Del Monte's valuable commercial and legal rights." [*Id.*].

On June 23, 2016, Roberto Aragon, the CEO of Ticofrut, spoke with Jorge Gurria, the CEO of INPROTSA. [ECF No. 106-1, ¶ 4]. During that conversation, Mr. Gurria described the arbitral proceedings and Award. [*Id.*]. To allay any concerns about continuing to purchase pineapples from INPROTSA after receipt of Del Monte's June 21 letter, Mr. Gurria offered to indemnify Ticofrut for costs associated with threatened litigation by Del Monte. [*Id.*].

On June 27 and June 29, 2016, Del Monte sent Ticofrut additional letters, again asserting that purchasing pineapples from INPROTSA would constitute interference with Del Monte's interests, and that Del Monte would "vigorously" enforce its rights, including but not limited to, filing legal proceedings against Ticofrut. [ECF No. 106-1, Exs. B, C].

Ticofrut, INPROTSA and their respective counsel communicated concerning indemnification and strategy with respect to Del Monte's threatened litigation, as they understood they had mutual legal interests in pursuing a common legal strategy. As part of these communications, on July 1, 2016, Mr. Gurria emailed Mr. Aragon a draft of the indemnification agreement. [*Id.* at ¶ 6].

On July 18, 2016, Del Monte filed a petition in Costa Rica seeking recognition and authorization of the Award against INPROTSA ("Petition to Confirm"), and on July 25, 2016, Del Monte commenced this action against Ticofrut in Miami-Dade Circuit Court. [ECF No. 1, Composite Ex. A, Compl.; ECF No. 10, Ex. A ¶ 13]. Del Monte attached the Award as the sole exhibit to the Complaint, referred to it in over a third of the Complaint's paragraphs, and relied on it in every count. [ECF No. 1, Compl. at Counts I-V and ¶¶ 12-16, 19, 21, 25-28, 31-34, 37-38, 42].

On September 7, 2016, Ticofrut and INPROTSA formalized and signed their indemnification agreement ("Indemnity Agreement").

On September 9, 2016, INPROTSA filed a petition to vacate the Award in Miami-Dade Circuit Court ("Petition to Vacate"), and on October 11, 2016, Del Monte filed a Motion to Dismiss the Petition to Vacate and Cross-Petition to Confirm the Award ("Cross-Petition").

On September 22, 2016, Del Monte served Ticofrut with its First Request for the Production of Documents ("Document Requests"). Del Monte asked Ticofrut to produce all agreements or understandings between Ticofrut and INPROTSA, including "documents referencing or evidencing the negotiations leading up to the execution of such . . . agreements, understandings or undertakings (including, without limitation, communications and draft contracts, agreements, understanding[s] or undertakings)." [ECF No. 109-2, Request 6]. Ticofrut also asked for all "contracts, agreements, understandings or undertakings between or among INPROTSA, on the one hand, and TicoFrut and/or Tampa Juice, on the other, which include provisions for indemnification, contribution, a litigation defense, and/or hold harmless." [*Id.* at Request 80].

On November 11, 2016, Ticofrut served Del Monte with its Amended Response to the Document Requests. [ECF No. 109-3]. Pursuant to a Protective Order entered in this case on November 18, 2016 [ECF No. 47], Ticofrut produced documents to Del Monte in December 2016. [ECF No. 109-4]. These productions included a copy of the

Indemnity Agreement, produced in accordance with Florida Rule of Civil Procedure 1.280(b)(2). Ticofrut also produced two emails between the CEOs of INPROTSA and Ticofrut concerning the status of the written indemnity agreement that were not protected by the attorney-client or work-product privileges. [March 31, 2017 Hearing Tr., at 10:2-9].

On January 9, 2017, Ticofrut produced a Privilege Log. [ECF No. 109-5].

On January 20, 2017, Del Monte's counsel contacted Ticofrut's counsel to object to Ticofrut withholding certain documents on the basis of the common interest doctrine. Despite subsequent discussions, the parties were unable to resolve the dispute, and on February 8, 2017, Del Monte filed its Notice of Discovery Hearing [ECF No. 82].

On March 31, 2017, this Court held the Hearing on whether Ticofrut was entitled to withhold documents based on certain privileges.

Pursuant to the Court's Order [ECF No. 105] issued after the Hearing, Ticofrut filed the Aragon Declaration on April 3, 2017, and submitted an amended Privilege Log to Del Monte days later. [ECF No. 109-6]. The Amended Privilege Log lists only 4 entries (emails and attachments) as protected by the common interest privilege: two, dated July 1 and 9, 2016, are withheld under the attorney-client and work-product privileges; and the other two, dated July 1 and 11, 2016, are withheld under only the

attorney-client privilege. [*Id.* at lines 54, 55, 65, 70]. Thus, the common interest issue before the Court has been narrowed to these four documents and attachments.

The post-hearing Order required Ticofrut's amended privilege log "to include a master key/chart that identifies the names of listed attorneys, explains who the clients are of such attorneys, describes the roles of such attorneys (i.e., in-house counsel for Defendant), and the location of the attorney (i.e., based in Costa Rica)[.]"

<u>The Indemnity Agreement [ECF No. 109-1]</u>

The Indemnity Agreement says that it was signed in Costa Rica on September 5, 2016. The agreement does not contain any confidentiality provisions. And it does not discuss a common or joint legal strategy. Instead, it allocates risk between INPROTSA and Ticofrut. Specifically, it provides that INPROTSA would "hold harmless, defend, exonerate, pay, reimburse or indemnify Ticofrut" for any claims by Del Monte.  It also provides that INPROTSA agreed to pay Ticofrut "within a maximum period of thirty calendar days, counted from the notice that Ticofrut gives INPROTSA in writing, of any amount that it has to pay Ticofrut under this Agreement."

In one of the "whereas" clauses, the Indemnity Agreement represents that "**Ticofrut** has requested INPROTSA to guarantee that Ticofrut will not have any sort of liability arising from the purchase of pineapple that Ticofrut has made and continues to make from INPROTSA[.]" (emphasis added).

8

<u>The Aragon Declaration [ECF No. 106-1]</u>

In his declaration, Aragon, Ticofrut's CEO, represented that he spoke to Jorge Gurria, INPROTSA's CEO, on June 23, 2016. According to the declaration, Aragon "agreed *in principle*" to an indemnification agreement during this telephone conversation. (emphasis added). In addition, his declaration states that **Gurria** (on behalf of **INPROTSA)**" offered to indemnify Ticofrut for costs associated with potential litigation with Del Monte." The declaration also said that Gurria made the indemnity offer "in order to assuage any **concerns** that Ticofrut may have had about continuing to **purchase pineapples** from INPROTSA in the wake of Del Monte's threatening June 21 Letter."

Aragon's declaration also says that Gurria sent him a draft of the indemnification agreement by email on July 1, 2016 and that Ticofrut and INPROTSA finalized the language with their attorneys and later entered into a formalized, signed indemnification agreement.

Significantly, Aragon's declaration does **<u>not</u>** say that he and Gurria agreed to enter into a common interest agreement or to keep communications confidential or to exchange material protected by the attorney-client privilege or the work product exception to discovery without waiving the privilege or the exception. Instead, the declaration discusses the Indemnity Agreement, which Ticofrut concedes is *not*

confidential (and which Ticofrut voluntarily produced in discovery). The declaration also does not say that the two CEOs agreed to cooperate in forming a common legal strategy. It says nothing about **strategy**, individual or cooperative.

<u>Ticofrut's Representations about the Indemnity Agreement</u>

In its post-hearing memorandum [ECF No. 109], Ticofrut represented that it and INPROTSA "formalized and signed their indemnification agreement" on September 7, 2016. It did not explain why it chose this date, rather than the September 5, 2016 date appearing on the agreement itself.

In any event, Ticofrut contended that the communications at issue (emails dated July 1, July 1, July 9 and July 11, 2016, plus attachments) "took place after Ticofrut and INPROTSA agreed to an indemnity agreement concerning this very litigation." [Given that the indemnity was "signed and formalized" in September 2016, Ticofrut must be referring to the agreement "in principle" which Aragon says he reached during the June 23, 2016 telephone call].

The four emails listed in Ticofrut's Amended Privilege Log were all authored by either Aragon or Gurria (non-attorneys) and sent to each other. They were all *copied* to attorneys. However, the log which Ticofrut attached to its memorandum does not include the required master key/chart, so the Undersigned does not know much about these attorneys other than their status as attorneys. One email (number 54) is described

as being about "indemnity and strategy of instant litigation." The second document (number 55) is described as an email about "indemnity." The third (number 65) is described as being about "instant litigation" and the fourth and final email at issue (number 70) is about "information and strategy for instant litigation."

Ticofrut's memorandum also argued that it and INPROTSA "intended and reasonably believed their confidential communications were part of an ongoing and joint effort to set up a common legal strategy." But Ticofrut has not submitted any actual **evidence** to support this critical argument. Aragon's declaration says nothing about a belief that the communications were confidential and it also says nothing about the communications being part of a joint effort to set up a common legal strategy. Those points are, for all practical purposes, pure attorney rhetoric, unsupported by evidence. The only reference, other than argument in a memorandum, is an attorney-produced privilege log, which describes two of the four emails as discussing strategy. But that is not the same as actual evidence.

Ticofrut has not argued that the four emails in question were marked "confidential" or "common interest" or "privileged" at the time.

In addition, Ticofrut has not argued that its own attorneys or attorneys for INPROTSA prepared the emails.

<u>Other Ticofrut-INPROTSA Emails (and What They Show about Timing)</u>

Although Ticofrut also argues [ECF No. 109, p. 7] that Aragon and Gurria "orally agreed" to an indemnification agreement during the June 23, 2016 telephone call, other emails sent later do not unequivocally confirm this. For example, on August 22, 2016, Aragon sent Gurria an email, asking "if you have any news from your attorneys in CR with respect to the indemnity agreement?" The email then says, "I have to inform our JD[3] of the events involved with the suit filed against us by DM and the subject of indemnity is very significant." And in an email sent earlier that same day, Gurria advised Aragon that he sent an email to INPROTSA's attorney "to find out what progress we are making with the Indemnity Agreement." He also wrote, "I hope that it is close to being concluded." [ECF No. 62-2, p. 2].

<u>Why Del Monte Says the Emails Are Highly Relevant</u>

Del Monte summarized its position on the legal relevance of the four emails (with attachments) in question in its memorandum [ECF No. 110]:

On June 21, 2016, Del Monte wrote to TicoFrut, demanding that TicoFrut immediately cease and desist from purchasing pineapples from INPROTSA in breach of the restrictive covenants in Del Monte's contract with INPROTSA and in violation of

_____

[3]     The translator's notes explain that "JD" is "Junta Directiva," which is Spanish for Board of Directors.

the ICC Permanent Injunction against INPROTSA to specifically enforce the restrictive covenants. According to Del Monte, TicoFrut's response to Del Monte's demand was to negotiate an indemnification agreement with INPROTSA to continue its wrongful conduct and refuse Del Monte's demand. Among Del Monte's claims against TicoFrut in this case is a claim for tortious interference with Del Monte's contract with INPROTSA.[4]

TicoFrut has sought to defend against the tortious interference claim, arguing that Del Monte cannot show that TicoFrut induced INPROTSA's breach or that TicoFrut intentionally interfered. [ECF No. 10]. The documents that are the subject of Del Monte's instant motion to compel[5] all relate to the circumstances surrounding and leading up to the Indemnity Agreement between TicoFrut and INPROTSA, including the communications between TicoFrut and its agents and INPROTSA and its agents.

---

[4]    Del Monte has also asserted four additional claims against TicoFrut: (i) aiding and abetting INPROTSA's breach of the restrictive covenant in INPROTSA's contract with Del Monte; (ii) aiding and abetting INPROTSA's violation of an ICC permanent injunction specifically enforcing the restrictive covenant; (iii) civil conspiracy to violate the permanent injunction; and (iv) civil conspiracy to breach INPROTSA's contractual obligations to Del Monte.

[5]    Under the Undersigned's Discovery Procedures Order, parties are not permitted to file motions to compel or other discovery motions. Instead, they notice for a hearing the discovery disputes. However, for all practical purposes, the dispute here can fairly be described as Del Monte's motion to compel.

Del Monte contends that these indemnification documents are not merely relevant to an issue in this case, but may constitute the operative facts establishing Del Monte's case. At the least, it says that the subject documents are at the heart of its tortious interference case against TicoFrut. Del Monte argues that TicoFrut hopes to shield these vital documents by baldly asserting attorney-client privilege, work product, and the common interest doctrine.

Applicable Legal Principles and Analysis

In the federal court system, the common interest doctrine has a less-than-certain scope because it was never codified in any federal rule of evidence. Proposed (though not adopted) Federal Rule of Evidence 503 codified the attorney-client privilege and explained that it applied to communications by the client or his lawyer "to a lawyer representing another in a matter of common interest" so long as the communication was made "for the purpose of facilitating the rendition of legal services to the client[.]"

But Congress rejected this proposed rule, leaving Federal Rule of Evidence 501 to govern evidentiary privileges. That rule provides that the privilege of a witness shall be governed by the principles of "[t]he common law -- as interpreted by the United States courts in the light of reason and experience[.]" Fed. R. Evid. 501. Nevertheless, Rule 501 also provides that in civil actions and proceedings, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." In other

words, for federal claims, federal common law governs evidentiary privileges, and a state's common law or rules of evidence control evidentiary privileges in cases based on state claims.

This lawsuit was initially filed in state court. Ticofrut removed it to this federal court pursuant to the Convention on the Recognition of Foreign Arbitral Awards, codified and implemented at 9 U.S.C. §§ 201-208. [ECF No. 1]. Therefore, for purposes of evaluating the so-called common interest doctrine, which relates to the attorney-client privilege and work product theories, federal common law applies.

The common interest doctrine is not, in and of itself, a *privilege*. Rather, it is an **exception** to the rule of waiver concerning the attorney-client privilege and the work product doctrine. Although the nuances may vary among circuit courts, there are several bedrock principles which most courts agree are applicable. These rules, which create the framework for evaluating Ticofrut's argument that the common interest doctrine entitles it to withhold from production the four emails in question, are outlined below, along with fundamental rules governing privilege:

1.     Ticofrut, as the party claiming the attorney-client privilege, the work product exception, and the common interest doctrine, has the burden of establishing their applicability. *Adelman v. Boy Scouts of America*, 276 F.R.D. 681, 689-90 (S.D. Fla. 2011). *Cf. In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 340-41 (4th Cir. 2005)

(noting that proponent of the joint defense privilege, which protects parties "who share a common interest in litigation," must establish the common interest, which means that "some sort of joint strategy is necessary").

2.      The party claiming the privilege (i.e., Ticofrut) must provide the Court with underlying facts demonstrating the existence of the privilege, which may be established by affidavit. If the affidavit is not "precise [enough] to bring the document within the rule, the Court has no basis on which to weigh the applicability of the claim of privilege." *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011) (internal quotation and marks omitted).

3.      "An improperly asserted claim of privilege is no claim of privilege at all." *Id.* (internal quotation and marks omitted).

4.      The burden to sustain a privilege is heavy because "privileges are 'not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.* (quoting *United States v. Nixon,* 418 U.S. 683, 710 (1974) (internal citation omitted)).

5.      The common interest doctrine does not create an independent privilege. Instead, it is an exception to the general rule that disclosure of otherwise privileged or confidential material waives the privilege. *Maplewood Partneres LP v. Indian Harbor Ins. Co.,* 295 F.R.D. 550, 605 (S.D. Fla. 2013).

6.     The common interest doctrine applies only "when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is **legal**, and not solely commercial." *Breslow v. Am. Sec. Ins. Co.*, No. 14-62834, 2016 WL 698124, at *9 (S.D. Fla. Feb. 19, 2016) (internal citations omitted).

7.     A shared interest in the outcome of litigation, or the fact that an opponent is a common adversary, is insufficient to justify successful invocation of the common interest doctrine. *Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*, 300 F.R.D. 590, 597 n. 10 (S.D. Fla. 2014); *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996).

8.     Parties seeking to use the common interest doctrine must in practice demonstrate cooperation in forming "a common legal strategy" because the doctrine "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Spencer v. Taco Bell, Corp.*, No. 8:12-cv-387, 2013 WL 12156093, at *2  (M.D. Fla. Apr. 23, 2013) (internal quotation and marks omitted); *see also Walsh*, 165 F.R.D. at 18 (finding that parties must show they had "a common legal, as opposed to commercial, interest, and that they cooperated in formulating a common legal strategy"); *Bank Brussels Lambert v. Credit Lyonnais (Suissee) S.A.*, 160 F.R.D. 437, 448 (S.D.N.Y. 1995) (finding that group members presented "no evidence that they formulated a joint legal strategy").

9.	To determine whether communications were made with a common interest, "one must first answer the questions whether the communication was 'made and maintained under circumstances where it is reasonable to assume that disclosure to third parties was not intended.'" *Guarantee Ins. Co.*, 300 F.R.D. at 596 (quoting *Visual Scene, Inc. v. Pilkington Bros., plc*, 508 So. 2d 437, 441 (Fla. 3d DCA 1987) (internal citation omitted).

10.	Courts evaluating a common interest doctrine claim often focus on whether the group members took affirmative steps to protect confidentiality. If steps are taken, then they support application of the doctrine. If there are no demonstrable efforts, then the absence might cause a court to reject the common interest claim. *Compare Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 309 (N.D. Cal. 1987) (applying common interest doctrine after noting that a group member took "substantial steps to assure [that the other member] maintained the confidentiality of the [communication]") *with Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999) ("refusing to extend the common interest privilege to situations where no efforts to acknowledge and protect the privileged status of the shared communications" and noting that there was "no indication" that the participants "understood the need to guard attentively against further disclosure if the privilege were to be retained").

11. The involvement of legal counsel is often a significant factor. If the communication is between various group members who are not attorneys, then the sharing of communication directly with a non-attorney member of the community may destroy the doctrine's availability. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007). *See also Restatement (Third) of the Law Governing Lawyers § 76, Comment d* ("However, a communication directly among the clients is not privileged unless made for the purpose of communicating with a privileged person[.]").

12. Although a common interest understanding need not necessarily be in writing or a particular form, "an agreement there must be." *Hunton & Willliams v. U.S. Dept. of Justice*, 590 F.3d 272, 286 (4th Cir. 2010); [6] *cf. Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005) ("Obviously, a written agreement is the most effective method of establishing the existence of a joint defense agreement, although an oral agreement whose existence, terms and scope are proved by the party asserting it, may be enforceable as well") (internal citation omitted). The *Minebea* Court also quoted a well-known evidence manual for the practical, common sense notion that "it is certainly prudent practice to execute a written agreement before significant communications are

_____

[6] In *Hunton & Willliams*, the Court noted that the parties failed to create a written common interest agreement until November 2005, and that neither party made any kind of "common interest" notation on their written communications until October 2005. *Id.*

exchanged" and for the realistic warning that "[w]ithout a written agreement, the party's burden of proving that a statement was made in the common interest will undoubtedly be more difficult." *Minebea*, 228 F.R.D. at 16 (quoting 2 Stephen A. Saltzburg, Et Al., Federal Rules Of Evidence Manual at 501-35-36 (8th ed. 2002)).

13.     As a general theme, albeit not a hard and fast rule because there are fact-specific exceptions, parties involved in arms-length business transactions (in contrast to collaborative business ventures, such as mergers) are less likely to qualify for common interest doctrine protection because there is a greater risk that courts will view them as adverse to each other and not covered by the common interest doctrine.  *See e.g., Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579-80 (N.D. Cal. 2007) (noting that protection does not "extend[] generally to disclosures made in connection with the prospective purchase of a business" and rejecting doctrine and noting that litigation abstract "might have been helpful to facilitate the potential commercial transaction" but "did not further a common legal strategy in connection with the instant litigation").[7]

_____

[7]     The *Nidec* Court further noted that the abstract was provided "in order to facilitate the [party's] funds and other potential bidders' commercial decision whether to buy the majority share in [the company]."*Id.* at 580. Therefore, the Court held, the abstract was "designed to further not a joint defense in this litigation but to further a commercial transaction in which the parties, if anything, have opposing interests." *Id.*

14.     Memorializing a common interest privilege through a formal written agreement should be done before the sharing of information begins. It is risky to exchange information before an agreement has been finalized because some courts have concluded that communications made before the date of the agreement are not protected. *See, e.g., Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 498 (S.D.N.Y. 2002) (noting that there was no joint defense effort or strategy in place when the disputed documents were created).

Framed by these principles, the Undersigned is not convinced that Ticofrut has met its burden of demonstrating that the four emails are entitled to protection under the common interest doctrine.

The epicenter of this analysis, however, is not the mere existence of the Indemnity Agreement. Ticofrut has already recognized that the agreement is not confidential and has produced it here in discovery. Therefore, Ticofrut is, in effect, arguing that it and INPROTSA entered into some type of agreement that other communications between them (other than the Indemnity Agreement itself) would somehow be protected.  But it has not even suggested when (or how) *that* purported agreement for purported confidentiality supposedly was created.

Initially, the Court notes that there is significant confusion over the circumstances and timing of the Indemnity Agreement itself. Was it entered into on

September 5?  Was it September 7? Was it back in June, when there was supposedly some sort of oral agreement "in principle?" Moreover, there is ambiguity over the significant circumstances underlying the Indemnity Agreement. Did INPROTSA suggest it?  Or did Ticofrut suggest it (or even demand it)?

Setting aside those issues, which generally undermine Ticofrut's ability to meet its burden, Ticofrut never provided any evidence to suggest that Aragon and Gurria had an agreement to keep their communications confidential. Nor did it submit any evidence to suggest that the companies themselves had such an agreement. Indeed, Ticofrut did not suggest that Aragon and Gurria even **discussed** the concept of confidentiality.  The mere fact that the two companies entered into a non-confidential Indemnity Agreement hardly means that communications between the indemnitor and indemnitee would thereafter automatically be confidential. *Cf. United States v. Weissman*, 195 F.3d 96, 99 (2d Cir. 1999) (rejecting argument of an implied joint defense agreement and noting that the common interest rule "requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given.") (internal quotation and marks omitted).

If Ticofrut and INPROTSA did have an agreement to keep their communications about a common, joint legal strategy confidential, then it must have been an oral, implied agreement, because nothing in writing has been submitted (and because

22

Ticofrut has not even argued that the parties agreed to keep their communications confidential). And Ticofrut has not argued, let alone proven, that there was a "before-the-exchange agreement stating their intention to maintain confidentiality[.]" *Guarantee Ins. Co.*, 300 F.R.D. at 597.

So there has been no evidence of any agreement to keep communications confidential. But, even if there had been such a discussion, then it is far from clear that the common interest doctrine would apply. That is because an indemnity agreement (and discussions about it) are not necessarily part of a "shared litigation strategy" or "an effort to arrive at a common defense to such possible litigation." *Taco Bell*, 2013 WL 12156093, at *2. In fact, there is no discussion at all in the Indemnity Agreement about a common defense and Ticofrut has submitted nothing other than conclusory rhetoric to meet its burden to demonstrate that the communications are merely "nothing more than an attempt to allocate the risk between parties to a commercial endeavor should such litigation occur." *Id*. at *3.

Although Ticofrut submitted the Aragon declaration, it says nothing about a shared legal, litigation strategy with INPROTSA. And, other than the declaration, Ticofrut has not submitted any other *evidence* (as opposed to rhetoric) that the parties were embarking on a joint legal strategy. The only "strategy" the evidence shows was being pursued was the indemnification -- and that is not confidential in the first place

and that is merely allocating business risk (and not advancing a legal strategy or common defense).

Ticofrut's Amended Privilege Log cryptically mentions that two of the four emails discussed strategy, but, without any evidence to support it, this claim appears to be little more than an after-the-fact, attorney-suggested attempt to not produce relevant information. Ticofrut did not explain who entered into the purported common interest arrangement and the Aragon declaration, the only actual evidence submitted, says nothing about it.

In addition, the declaration itself suggests that the indemnity was designed to promote commercial business interests (buying and selling pineapples), rather than to agree upon a common legal strategy. The indemnity was designed to "assuage any concerns Ticofrut may have had about continuing to purchase pineapples[.]" This is insufficient to establish a common *legal* interest (as opposed to a commercial or business interest).

The Undersigned is not persuaded by Ticofrut's argument. The Indemnity Agreement and related communications appear to "constitute a settlement agreement," rather than "characterized as subject to the common interest doctrine." *Jeld-Wen, Inc. v. Nebula Glasslam Int'l, Inc.*, No. 07-22326, 2008 WL 756455, at *10 (S.D. Fla. Mar. 11, 2008). *See also Laforest v. Honeywell Int'l Inc.*, No. 03-CV-6248T, 2004 WL 1498916, at *3

(W.D.N.Y. July 1, 2004) (concluding that indemnification agreement "represents more of an understanding among adversaries, than among parties with identical or common legal interests.") (internal quotation and marks omitted).

In addition, Ticofrut has not argued that the emails (with attachments) it seeks to withhold were marked confidential or subject to the common interest rule, nor has it represented that the parties took any actual **steps** to shore up confidentiality. *Hunton & Williams*, 590 F.3d at 286 (noting that attorney was "experienced" and knew how to create a written common interest agreement -- but did not do so – and explaining that "neither party made any kind of 'common interest' notation on their written communications" during times at issue to the common interest claim).

## Conclusion

As outlined above, Ticofrut's alleged oral common interest doctrine agreement is unconvincing for *several* reasons, and the Undersigned finds that Ticofrut has not met its burden to establish it. I reject the argument. Therefore, Ticofrut shall produce to Del Monte the four emails (with attachments) within three business days of this Order.

**DONE and ORDERED,** in Chambers, in Miami, Florida, on May 2, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
The Honorable Jose E. Martinez
All counsel of record